## TIMKEN–DETROIT AXEL CO. v. DAY–ELDER MOTORS CORPORATION.

District Court, D. New Jersey. September 22, 1927.

Sales ☞94—Buyer, under second contract abrogating sale contract, held entitled to tires purchased with money it deposited for performance of first contract.

Where buyer of automobile chassis advanced certain sum to be held in escrow for faithful performance, and subsequently allowed seller to expend such money for tires to be placed in trust with officer of seller, buyer *held* entitled to such tires under terms of subsequent contract abrogating original contract of sale, where such terms provided that all money placed in escrow by buyer under first contract should be forfeited except that which was invested in tires, and that tires should continue to be held by seller's officer subject to trust agreement.

In Equity. Suit by the Timken-Detroit Axel Company against the Day-Elder Motors Corporation, wherein Charles P. Day filed a petition praying that the receivers of the defendant be directed to deliver certain tires to him, and for an order to show cause why rights in such tires should not be adjudicated. Tires held to be the property of the Twentieth Century Motors Corporation.

Decree affirmed 25 F.(2d) 195.

Bernard V. McGovern, of Newark, N. J., for petitioner.

Arthur T. Vanderbilt, of Newark, N. J., for receivers of Day-Elder Motors Corporation.

John A. Mullen, of New York City, for Twentieth Century Motors Corporation.

Winthrop & Stimson and Allen T. Klots, both of New York City (Arthur E. Pettit, of New York City, of counsel), for Hamilton Nat. Bank.

RUNYON, District Judge. This is a petition by Charles P. Day, praying that the receivers of the Day-Elder Corporation be directed to deliver to him as trustee 430 Goodyear cord tires held by them, and, for an order directing such receivers, the Twentieth Century Motors Corporation, and the Hamilton National Bank to show cause why their respective rights in and to the tires should not be adjudicated and the petitioner discharged of the trust undertaken pursuant to an agreement dated November 30, 1925.

On October 23, 1925, the Day-Elder Corporation, called the vendor, entered into a contract with the Twentieth Century Motors Corporation, called the vendee, wherein and whereby the vendor agreed to manufacture and deliver to the vendee, and the vendee agreed to purchase 500 taxicab chassis at the agreed price of $1,245.27 each, said price being based upon the then existing market price of material.

The ninth paragraph of said contract is as follows:

"Vendee agrees to advance on the execution of this contract the sum of ten thousand dollars ($10,000) to be held in escrow by the Hamilton National Bank as security for the faithful performance by the vendee of the terms of the contract. The vendor shall have the option to release said fund from the escrow and of employing said money in the financing and purchase of materials for the chassis upon delivery to the vendee security satisfactory to the vendee for the proper application of the fund under the terms hereof. Vendor further agrees if it exercises said option that the said sum will be applied pro rata against the purchase price of the last 50 chassis to be furnished under this contract."

Pursuant to this paragraph, the Twentieth Century Motors Corporation, on or about October 27, 1925, deposited in escrow the sum of $10,000 with the Hamilton National Bank of New York City.

On or about November 30, 1925, the Hamilton National Bank advanced out of the escrow moneys the sum of $9,185 for the purchase of 500 Goodyear cord tires. This advance was made in accordance with paragraph 9 above set forth and by reason of a further agreement dated November 30, 1925, between said Charles P. Day and the Hamilton National Bank and the Twentieth Century Motors Corporation, wherein Mr. Day, in consideration of the advance of $9,185, agreed to become personally liable to said Hamilton National Bank and the Twentieth Century Motors Corporation as trustee, to hold the said tires and to see that they were used only on taxicabs manufactured by the Day-Elder Motors Corporation. The agreement further provided that, as the Twentieth Century Motors Corporation paid for each taxicab chassis manufactured under the original agreement, the sum of $91.85, covering one set of tires, would be paid by the Day-Elder Company into the escrow fund.

On April 15, 1926, another contract was made between the Day-Elder Corporation and the Twentieth Century Motors Corporation, together with H. H. Babcock Company as a third party, in which the following recital and provisions appear:

"* * * Whereas difficulties have arisen which in the judgment of the parties hereto, render the further performance of

the said contract of October 23, 1925, impractical:

"Now therefore, in consideration of the mutual agreements hereinafter set forth, the parties hereto do agree as follows:

"1. The said two contracts one between Day-Elder Motors Corporation and Twentieth Century Motors Corporation, both bearing date of October 23, 1925, be and the same hereby are abrogated and the parties thereto released from the provisions thereof. * * *

"9. All moneys or their equivalent given as a security or placed in escrow by the Twentieth Century Motors Corporation under the provisions of the said two agreements of October 23, 1925, one between Day-Elder Motors Corporation and the Twentieth Century Motors Corporation and the other between H. H. Babcock Company and Twentieth Century Motors Corporation are hereby forfeited and their repayment waived by the said Twentieth Century Motors Corporation except as follows:

"10. Under the agreement of October 23, 1925, between Day-Elder Motors Corporation and Twentieth Century Motors Corporation there was placed in escrow with the Hamilton National Bank of New York City, the sum of ten thousand dollars ($10,000) as security for the performance by the Twentieth Century Motors Corporation of the terms of said contract. Subsequently, and by an agreement dated November 30, 1925, $9,185 of the said ten thousand dollars ($10,000) escrow fund was converted into tires, which tires were placed in trust with Charles P. Day, of the Day-Elder Motors Corporation, for the purpose of placing said tires on taxicabs manufactured under the provisions of the said contract of October 23, 1925, and to be used by him for no other purpose.

"11. It is understood and agreed that the tires so held by Charles P. Day, of Day-Elders Motors Corporation, shall continue to be held by him subject to the trust agreement of November 30, 1925.

"12. It is understood and agreed that the sales agent (Twentieth Century Motors Corporation) shall retain out of the deposit and down payment on the purchase price of each car the sum of $26.60 and out of the said deposit and down payment on the purchase price of each car shall, in addition to said $26.60, pay direct to the Hamilton National Bank for the account of Charles P. Day, trustee under the trust agreement of November 30, 1925, the sum of $91.85, and in addition shall retain out of said deposit and down payment on the purchase price of each

car, the said sum of one hundred dollars ($100) as its selling commission mentioned in paragraph second hereof."

By order of this court entered on July 2, 1926, receivers were appointed for the defendant Day-Elder Motors Corporation, and, having qualified, they proceeded to take possession of the property of such defendant. Included in this taking were the tires hereinbefore referred to, and it is to have determined the rights of the various parties in and to such tires that this proceeding has been instituted.

It is unfortunate that so much of ambiguity has entered into the various writings going to constitute the present status of the parties as to make the task of interpretation no easy matter.

Certain features, however, stand out with fair clarity. In the first place, the contract of October 25, 1925, effected the establishment of the $10,000 escrow fund, deposited with the Hamilton National Bank as security for the Twentieth Century Company's faithful performance of its part of the contract which was to purchase taxicab chassis of Day-Elder Motors Corporation manufacture.

It also gave to the Day-Elder Company the right to release this fund from escrow and to make use of the money for its own purposes of manufacture provided it should deliver to the Twentieth Century Company satisfactory security to insure the application of the fund to the purposes contemplated in the agreement.

By this arrangement the Twentieth Century Company not only fulfilled its part in furnishing security for its own performance, but offered to lend that very security to the Day-Elder Company for the financing and purchase of materials for the chassis to be built, provided the Day-Elder Company furnish security for such loan, which it was to reduce by installments in connection with the delivery of completed chassis to the Twentieth Century Company.

This offered loan was taken advantage of by the Day-Elder Company on November 30, 1925, when the Hamilton National Bank advanced out of the escrow money held by it $9,185 for the purchase of 500 Goodyear cord tires.

This advance necessitated the arrangement of other security satisfactory to the Twentieth Century Company, whose money it was in the sense that it had obligated itself to the Hamilton Bank for its repayment and the Day-Elder Company met the situation in a letter addressed to the Twentieth

Century Company and the Hamilton Bank, which letter reads as follows:

"Irvington, N. J., November 30, 1925.

"Twentieth Century Motors Corporation, 900 8th Ave., New York City, N. Y., and Hamilton National Bank, 130 West 42d Street, New York City, N. Y.—Gentlemen: As per agreement made the 23d day of October, 1925, between Day-Elder Motors Corporation and Twentieth Century Motors Corporation, and in particular paragraph 9 of said agreement, we wish to advise you that in consideration of your advancing from the escrow fund deposited with the Hamilton National Bank the sum of $9,185.00 to pay for 500 Goodyear all weather tread 30" x 5" cord cases, with regular tubes and valves, we have arranged with our president, Mr. Charles P. Day, to become personally responsible to you and the bank, as trustee, to hold these tires and issue them only to be used on taxicabs manufactured by us for you. As you pay us for each taxicab manufactured under the agreement dated October 23d, 1925, the sum of $91.85 covering one set of tires will be paid back into the escrow fund held by the Hamilton National Bank.

"So that there will be no question but that the escrow money is being used to finance the purchase of these tires, we are including a receipted bill to the Hamilton National Bank covering these tires.

"This letter signed in quadruplicate this 30th day of November, 1925.

"Yours very truly,

"Day-Elder Motors Corporation,

"[Signed]   Chas. P. Day, President."

In other words, the security required by the Twentieth Century Company took the form of tires lodged in Mr. Day's keeping, plus his agreement to become personally responsible to the Twentieth Century Company and the bank, as trustee, to hold them and to issue them only on taxicabs manufactured by the Day-Elder Company for the Twentieth Century Company.

Nothing in the situation above outlined can be construed as having vested any rights in the tires in the Day-Elder Company, as the tires were the quid pro quo only for the money, and the money awaited the outcome of certain contractual relations before becoming a proper subject for transfer of ownership.

While not appearing in detail, it may be surmised from later happenings that progress under the original contract left much to be desired. At any rate, another contract came into being on April 15, 1926, to which the Day-Elder Company, Twentieth Cen-

tury Company, and H. H. Babcock Company were parties, and which dealt with the same subject-matter in general as that contained in the original contract.

In addition to the other recitals in this contract hereinabove quoted and here repeated is the following prefatory paragraph showing the sales status at the time, viz.:

"Whereas, pursuant to said contracts Day-Elder Motors Corporation and H. H. Babcock Company have either built or committed themselves to build one hundred chassis and bodies, six of which have already been sold; and

"Whereas, difficulties have arisen which in the judgment of the parties hereto, render the further performance of the said contracts of October 23, 1925, impractical:

"Now, therefore, in consideration of the mutual agreements hereinafter set forth, the parties hereto do agree as follows:

"1. The said two contracts, one between Day-Elder Motors Corporation and Twentieth Century Motors Corporation and the other between H. H. Babcock Company and Twentieth Century Motors Corporation both bearing date of October 23, 1925, be and the same hereby are abrogated and the parties thereto released from the provisions thereof."

If the relationship between the parties had found its termination in the recital last above set forth, there could be no dispute as to the right of each party to possess itself of its original belongings, or, as in the case of the Twentieth Century Company, belongings in the substituted form of tires, and to withdraw from any and all further dealings with the others.

But such is not the case, and it therefore becomes necessary to examine the remainder of the contract of April 15, 1926, to ascertain, if possible, whose is the right to the tires in question.

This contract, in brief, declares that the Day-Elder and Babcock Companies will complete the manufacture of 94 taxicabs which the Twentieth Century Company will sell at specified prices for each type of car manufactured, and for which service it will be paid $100 per car, with certain variations in case there should be increases or decreases in the selling prices of cars.

The Twentieth Century Company will sell the 94 taxicabs within 6 months and have New York City as its exclusive territory, while the other parties may sell any of the 94 outside of New York City, provided they pay the Twentieth Century Company its full commission as above provided.

If the Twentieth Century Company fails to sell 10 taxicabs before June 1, 1926, or 10 in any calendar month thereafter, provided prompt deliveries are made to it upon its requisition for cabs, then the other parties shall have the right to sell cabs outside of New York City without the payment of commissions.

If the other parties or their finance company have to repossess themselves of any sold cars, the Twentieth Century Company shall return the commissions and other installment payments later specified, but shall again collect same if it later sells such cars.

After the 94 cars are disposed of, the Day-Elder or Babcock Companies shall sell no more cars in New York state under the name of Twentieth Century.

Then follow certain provisions concerning showrooms, rentals, displays, etc., which have no special bearing upon the question under advisement.

The remainder of this contract, as contained in sections 9, 10, 11, and 12, heretofore set forth in full, deals directly with the subject-matter of the present dispute, and sections 13 to 19, inclusive, outlining a system of financing, payment of commissions, etc., also have their bearing as furnishing a complete picture of the proposed dealings between the parties.

As already noted, section 1, in unequivocal language, abrogates the two contracts of October 23, 1925, and releases the parties from the provisions.

Sections 2, 3, and 4 set up a new and different system of manufacture and sales, and also take into consideration the procedure to be adopted in case the Twentieth Century Company fails to carry out its program of sales, a part of which procedure contemplates sales by the Day-Elder and Babcock Companies and the payment of the regular commissions to the Twentieth Century Company, and another part authorizing sales by these two companies without the payment of such commissions.

Sections 5, 6, 7, and 8 provide a limitation of the rights of Day-Elder and Babcock Companies to sell cars in New York state, and deal with the maintenance of showrooms displays, minor installations, licenses, etc.

Sections 13 and 14 deal with commissions and stated payments of $118.45 on each car sold, subject to pro rata variations in case of car price fluctuations.

Sections 15, 16, 17, and 18 deal entirely with the undertakings of the Day-Elder and Babcock Companies to provide service and financing, and with the limitations imposed

upon the Twentieth Century Company as to representations and guaranties.

The last section (19) states that the terms of the contract are based on the assumption of continued financing from a certain company, and that, in the event of this company's failure to continue such financing, the parties to the contract are temporarily relieved of the obligations thereunder until such time as the Day-Elder and Babcock Companies can make other arrangements.

This new contract changes the relationship of the parties, in that it establishes the relationship of principal and agent instead of maintaining the former one of vendor and vendee set out in the original contract. The consideration is the "mutual agreement hereinafter set forth" and a reading of all the sections, exclusive of the disputed ones, 9, 10, 11, and 12, discloses an arrangement which is apparently complete, and designed to meet any one of several contingencies. The only forfeiture mentioned in these other sections is a forfeiture of commissions by the Twentieth Century Company under certain conditions. Nowhere is there any provision looking to liquidated damages, even if the Twentieth Century Company fails to sell a single car.

But a reference to forfeiture does appear in the disputed sections and includes "all moneys or their equivalent" given as security or placed in escrow by the Twentieth Century Company with the Day-Elder and Babcock Companies. These moneys and equivalent are declared forfeited and their repayment waived by the Twentieth Century Company, "except as follows."

The word "except" must be taken as imposing some limitation upon any forfeiture to the Day-Elder Company, as distinguished from the positive surrender to the Babcock Company. What the reasons were, if any, for the differentiation, do not appear, but it is a fact, as I gather it from the briefs, that the Day-Elder and Babcock Companies had a working agreement between themselves for the division of the returns from the sale of 94 taxicabs, executed on the same day as the latest contract with the Twentieth Century Company, and it must therefore be concluded that each of the parties was cognizant of the full situation and acquiesced therein.

The Twentieth Century Company had put up $10,000 as security for performance of its contract with the Day-Elder Company, builder of chassis, and $15,000 as security in connection with the Babcock Company's contract to build and mount automobile bodies.

25 F.(2d)—13

The Day-Elder fund had been transformed mainly into tires, and these were held by a trustee acknowledging himself personally liable to the Hamilton Bank and the Twentieth Century Company, to see that the tires in question were placed on manufactured chassis.

The Babcock fund had apparently been transformed also, and these substituted forms are properly described as the "equivalents" of the moneys originally given as security or placed in escrow.

My reading of this contract leads me to the belief that the parties intended to except these tires from the general forfeiture. The Day-Elder Company had had all the benefit to be derived from the fund deposited in escrow, while the Twentieth Century Company had had none. As a result of the option given, Day-Elder had been relieved of the necessity of financing tire purchases, and had used the Twentieth Century's money instead, and at no greater expenditure than the pledge of its president, as trustee for the bank and the Twentieth Century, that the tires should be used for one purpose only.

The agreement of April 15, 1926, later comes into being, and with a simple recital that performance of the original agreements had proved impractical, proceeds to abrogate them and to release the parties from the provisions thereof. Unless some feature, appearing later in the contract, is inconsistent with or contradicts this release of parties, such release must be taken to be absolute, and to divest the escrow funds and their equivalents from partaking of the character of liquidated damages for any default theretofore occurring.

Certainly there is nothing in this latest contract which calls upon the funds or their equivalents to answer for any future defaults, and consequently any later default on the part of the Twentieth Century Company cannot of itself effect a forfeiture of the tires. The only characterization of the escrow fund as security for faithful performance is contained in the original contract, abrogated by the later one, which also releases the parties.

The forfeiture to the Babcock Company must be conceded as being unequivocal and therefore contradictory of any total release of the Twentieth Century Company from the forfeiture proclaimed.

But with the tires, the case, I believe, is different. Had a total forfeiture thereof been intended, the language of the ninth section without the suggestion of exception would have proved in every way adequate, and the exception must therefore be deemed to establish a different status.

And in this connection the continuance of Mr. Day's trusteeship appearing in section 11 is significant. Mr. Day, in the communication of November 30, 1925, had been constituted trustee for the Twentieth Century Company and the Hamilton National Bank. His whole function seems to have been the safeguarding of the interests of these two parties, to the end that the tires should be used for one purpose only. Nowhere does the Day-Elder Company claim him as a trustee for itself, but seemingly acquiesced in a situation which developed largely to its own advantage and which insured a ready and total supply of tires, at no expenditure of its own money.

Under the provisions of section 11, this trusteeship is continued "subject to the trust agreement of November 30, 1925." And this trust agreement of the Day-Elder Company states to the bank and the Twentieth Century Company that, "in consideration of your advancing from the escrow fund deposited with the Hamilton National Bank the sum of $9,185 to pay for 500 Goodyear all weather tread 30″ x 5″ cord cases, with regular tubes and valves, we have arranged with our president, Mr. Charles P. Day, to become personally responsible to you and the bank, as trustee, to hold these tires and issue them only to be used on taxicabs manufactured by us for you. As you pay us for each taxicab manufactured under the agreement dated October 23, 1925, the sum of $91.85 covering one set of tires will be paid back into the escrow fund held by the Hamilton National Bank.

"So that there will be no question but that the escrow money is being used to finance the purchase of these tires, we are including a receipted bill to the Hamilton National Bank covering these tires. * * *"

It appears to me that this continued trusteeship is more than a simple convenience in helping reimburse the Twentieth Century Company to the extent of one-half for funds forfeited by it to Day-Elder and Babcock. Such a suggestion has been made, but to me it appears from a reading of the whole contract that the trusteeship was rather a safeguarding of the Twentieth Century's ownership of the tires during the period in which the Day-Elder and Babcock Companies should endeavor to work out their own salvation. This interpretation appeals to me as the reasonable one because of the fact that it seems to be the Day-Elder and Babcock Companies which were obligating themselves

to do most of the work, while it was the Twentieth Century Company which was to receive from sales made by any or all of the three contracting companies certain allowances which in the aggregate, while continuing the manufacturers' supply of tires, would afford it complete reimbursement for the sum owed by it to the Hamilton National Bank, and would also constitute partial reimbursement for the funds forfeited by it to the Babcock Company. No one of the companies had found the original proposition a profitable venture, but I am unable to read into the contract of April 15, 1926, any determination of the parties that the Twentieth Century Company should be virtually penalized to the full extent of its security and escrow moneys.

Were such determination a fact, the trusteeship of the tires could have had no real meaning. With the tires the property of the Day-Elder Company, the disposition of them would have been completely within their power and right to determine, and the Twentieth Century Company could have interfered in no way. Why then should Mr. Day have been willing to continue a personal responsibility to a party or parties whose rights in the subject-matter had entirely disappeared?

I fail to see a good or valid reason. And, summing it up, I find that the original contract was abrogated without a forfeiture of the tires; that the exception mentioned in paragraph 9, and set out in paragraphs 10, 11, and 12 of the contract of April 15, 1926, exempts said tires from the general forfeiture declared in said paragraph 9; that, in consequence, the tires are the property of the Twentieth Century Company; and finally, that the receivers and petitioner should dispossess themselves of said tires, and, pursuant to the intent and purport to be inferred from the terms of the trust agreement of November 30, 1925, turn them over to said the Twentieth Century Company and the Hamilton National Bank.

An order in accordance with the above may be presented.